United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C S BIO CO., et al.,

Plaintiffs,

v.

COMERICA BANK,

Defendant.

Case No. 22-cv-05033-RS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT**

I. INTRODUCTION

As described in prior orders, plaintiffs CS Bio Co. and CCS Management, LLC (collectively "CS") are related commercial entities who had a long-term banking relationship with defendant Comerica Bank. CS brought this action alleging, in essence, that Comerica backtracked on its promises to provide a new loan to fund the construction of improvements to a property CS owned. The initial complaint was dismissed for failure to allege plausibly that Comerica made misrepresentations on which CS reasonably relied.

The First Amended Complaint presented a slightly different factual basis and legal theory to support the fraud and related claims, but still fell short of stating a claim. CS was provided a final opportunity to amend. In its Second Amended Complaint ("SAC"), CS now alleges facts and articulates a theory sufficient to "nudge" some of the claims "across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), such that dismissal of the entire action at the pleading stage is not warranted. The motion to dismiss must still be granted as to

other claims that are not viable.

## II. BACKGROUND

The broad factual circumstances alleged in the SAC largely conform to those set out in prior pleadings and discussed in prior orders. In 2019, CS engaged a general contractor in anticipation of making significant improvements to certain commercial real estate it owned in Milpitas. The project was expected to cost approximately $13.6 million, which CS intended to fund with $2 million of its existing resources, and an $11.6 million loan from Comerica, $5 million of which was to be guaranteed by the Small Business Administration ("SBA").[1]
CS had been doing business with Comerica since 2013, and had existing loans from the bank on other properties.

CS began the loan application process in June of 2019. Comerica advised CS that loan approval would be quicker and easier if CS reduced its existing loan portfolio at the bank. CS therefore replaced one Comerica loan, for approximately $3 million with interest at 3%, with a loan from another lender at 4.25%.

The original complaint and the FAC both alleged the parties entered into a "letter agreement" after "extensive negotiations" between CS and Comerica's Business Banking group. The prior complaints did not attach the purported letter agreement or describe its terms in any detail. The SAC, in contrast, attaches a copy of the document, which bears a date of "July __, 2020." SAC, Exh. A. Although the exhibit shows a signature by a representative of CS, there is no dispute it was never signed by Comerica. None of CS's claims are based on argument that the

---

[1] The first two versions of the complaint described the $5 million as a loan directly from the SBA, rather than merely a guarantee, such that Comerica would have only been loaning $6.6 million. Under a "term sheet" signed by the parties in September of 2020, as discussed further below, it appears the original allegations were more accurate. According to the term sheet, the parties anticipated Comerica would issue a primary loan of approximately $6.6 million and a "bridge loan" during construction, which would be repaid by the proceeds of a separate loan from the SBA. While these discrepancies and unexplained changes in the factual allegations suggest aspects of the complaints were prepared without sufficient care, it is not a basis to dismiss.

proposed "letter agreement" gave rise to an enforceable contract.[2] That said, when Comerica ultimately advised CS that it would not proceed with the financing, it referred to and purported to terminate "the Amended and Restated Letter Agreement dated July 31, 2020, between CS Bio Co and Comerica Bank." SAC, Exh. F. The record does not include a copy of any "Amended and Restated" letter agreement, and neither party explains whether this was a reference to the "July __, 2020" letter agreement or some later revision thereof.

Around the same time the letter agreement was proposed, responsibility for the loan application within Comerica was transferred from the Business Banking group (with whom CS had the long-term relationship) to Peter Wentworth and Bill Burke of the bank's "middle market division." Wentworth and Burke had no prior experience with CS. Like the prior complaints, the SAC asserts "on information and belief" that Wentworth and Burke are both Vice Presidents at Comerica.

Construction of "Phase I" at the property began in or about June of 2020, with CS funding the initial payments to the contractor itself. Because it could "elect to halt construction by mid-September 2020," before proceeding to "Phase II," CS asked Wentworth and Burke about the loan status "several times during the summer and fall of 2020." CS's CEO, Jason Chang, was repeatedly assured the loan for "Phase II" would be approved and that CS should continue to advance construction costs. Comerica told CS to go forward, because it would be reimbursed when the loan went through.

In early September of 2020, Comerica issued a "term sheet," as described in further detail in prior orders. The SAC asserts Comerica represented that (1) once a term sheet was issued, the loan would be approved, (2) term sheets were only issued after loans were internally approved by the bank, (3) the term sheet issued only because Comerica's "Credit partners"—Comerica's

[2] Again, the fact that CS originally alleged the parties had formed the "letter agreement," despite the fact it did not attach a copy, and has never produced a copy executed by Comerica, suggests CS may not have given sufficient attention to ensuring the allegations of its prior complaints were accurate and supportable.

internal credit team responsible for loan approvals—had provided a "green light" to do so, and (4) Comerica's middle market division had "approval to move forward [with the loan] as presented." As described in prior orders, however, the term sheet was replete with conditions and boldfaced warnings that it was not a promise. *See* SAC, Exh. D. ("THIS PROPOSAL IS FOR DISCUSSION PURPOSES ONLY. It does not represent a commitment to loan on the part of Comerica/SBA.")

The SAC asserts the financial covenants in the term sheet for which CS had responsibility were all matters that had previously been discussed and agreed on. The SAC alleges CS signed the term sheet only following a teleconference in which "the fact that C S Bio met the existing financial covenants contained in the term sheet was confirmed." SAC, para. 34. CS alleges it paid its contractor an additional $308,000, and continued its construction project in reliance on the assurances it received in connection with the term sheet. Additionally, in late September of 2020, C S Bio signed a "Phase 2 – Tenant Improvement" change order, which it contends it had delayed signing until it received Comerica's assurances of loan funding.

CS contends that prior to December 16, 2020, it had no reason to believe Comerica would not issue final approval and fund the loan, or that there was cause for any substantial concern. In October and November of 2020, however, the parties had a series of communications regarding at least three topics bearing on whether final approval and funding of the loan was forthcoming.

First, according to CS, the loan should have funded as a matter of course when the SBA issued the guarantee. CS alleges it was told during "multiple check-in calls" that the loan would be funded once the "SBA loan/guarantee" was approved.[3] The SAC asserts that upon SBA approval, Comerica instead "strangely" requested "updated covenant calcs from [C S Bio's finance manager] showing no defaults," which CS insists it had already provided. CS also alleges Comerica then claimed loan funding would need to await completion of subordination of the

---

[3] The complaint's use of the term "loan/guarantee" adds to the uncertainty as to whether the SBA was providing a loan (as alleged in the first two complaints) or only a guarantee (as alleged in the SAC).

SBA's guarantee to Comerica's pending loan.[4] The SAC alleges a Comerica representative later told CS that the bank had used SBA subordination as an excuse to prevent loan funding because, by November 19, 2020, Comerica had either already decided or was in the process of deciding not to fund the loan for other reasons.

Second, the parties had several discussions regarding Intarcia, a pharmaceutical firm that CS acknowledges was its largest customer, accounting for more than 50% of its revenues since 2015. CS alleges it advised Comerica there was a risk Intarcia would declare bankruptcy, but that Comerica assured CS that would not preclude closing the loan, because CS would be permitted to show cash receipts from other customers. SAC, para. 46. CS alleges that, in fact, Comerica's credit team decided sometime in November of 2020 not to fund the loan in light of reports from Wentworth and Burke regarding the Intarcia issue. The SAC asserts "Wentworth and Burke never advised C S Bio of their concerns or the concerns of Comerica's credit team because they did not want to upset an important customer and because they either anticipated or hoped that the SBA would not issue its guarantee. If the SBA failed to issue its guarantee, Comerica could blame the failure to fund the loan on the SBA." SAC, para. 49.

The third ongoing issue involved a "Financial Covenants and Ratios" ("FCCR") requirement CS admits it was obligated to satisfy to obtain the loan. FCCR is, according to the SAC, "a measure of C S Bio's ability to pay 'fixed' charges such as rent, debt service, and utilities." On November 11, 2020, CS provided documentation to Comerica showing its FCCR was 0.84 and therefore not in compliance with either the July 2020 letter agreement (requiring a FCCR of not less than 1.0), or the Term Sheet (requiring a FCCR of 1.20 or greater with exclusion of up to $2,028,000 in capital expenditures for construction). In the following days, however, Comerica directed CS to recalculate the FCCR and ultimately approved a calculation of a FCCR of 2.15, which was based on removing construction costs of, $2.3 million—*i.e.*, an amount greater

[4] The SAC does not explain how or why a loan "guarantee" would be "subordinated" to an underlying loan. Presumably subordination was an issue because the SBA was actually making a separate loan, not just a "guarantee."

than the $2,028,000 specified in the term sheet as excludable.

Shortly thereafter, CS asked Comerica what it should do about a pending construction invoice from its contractor issued in late October in the amount of $738,000. Burke and Wentworth advised CS to pay the invoice because it would be reimbursed later through the receipt of loan proceeds, despite the fact that CS had already surpassed the maximum $2,028,000 in construction costs excludable under the term sheet from the FCCR calculation. The SAC alleges Comerica assured CS that any violation of the FCCR covenant would be waived. SAC para. 64. CS alleges it then paid the $738,000 invoice in reliance on Comerica's representations.

Days later, in early December of 2020, Burke and Wentworth advised CS that it was "pencils down" on C S Bio's loan and that the loan would not be funded. Then, on December 17, 2020, Comerica gave written notice that it had decided not to proceed with the loan because CS Bio was in default of the required "fixed charge coverage ratio" covenant as of September 30, 2020. As noted above, the notice specifically cited "the Amended and Restated Letter Agreement dated July 31, 2020, between CS Bio Co and Comerica Bank." Whether or not that is the same as, or a later version of, the unsigned letter agreement of "July __ 2020," remains unclear. In either event, however, an inference can be drawn that Comerica believed it might have incurred contractual obligations in July of 2020, that it could avoid only if CS had not complied with its corresponding obligations.

## III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard asks for "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679. Claims sounding in fraud must meet a somewhat higher specificity standard as provided by Rule 9 of the Federal Rules of Civil Procedure.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Id.* at 1242 (internal quotation marks and citation omitted). When evaluating such a motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).

## IV. DISCUSSION

A. First Claim for Relief: "Fraud — Intentional Misrepresentation"

The SAC sets out the alleged misrepresentations in four lettered subparagraphs of paragraph 74. Subparagraph (a) lists four alleged statements made by Comerica representatives to CS on September 2nd and 4th, 2020.

-- once a term sheet was issued the loan would be approved by Comerica.

-- term sheets were only issued by Comerica after loans were internally approved by the bank.

-- Comerica's credit team had provided a "green light" to issue the term sheet

-- Comerica's middle market team had approval to provide the as-requested loan.

None of these statements are actionable. As to the first statement, any representation that the loan "would be approved" upon issuance of a term sheet cannot be reasonably understood as overriding the terms and conditions set out in the term sheet itself. As to the other three statements, CS has alleged no facts whatsoever to suggest those statements were false. While the

United States District Court
Northern District of California

SAC includes some allegations speculating that Comerica began to have serious concerns about going forward with the loan by November of 2020, there is nothing to support an inference that the term sheet issued without a "green light" or internal approval—subject, of course, to eventual fulfillment of all of the conditions stated therein.[5]

Subparagraphs (b)-(d) focus on communications between CS and Comerica in late November of 2020. All of the purported misrepresentations constitute *promises* as to future events, and therefore are actionable only to the extent the allegations satisfy the requirements for pleading promissory fraud. While it is not improper to include alleged false promises in a claim for "Fraud—Intentional Misrepresentation," here the SAC realleges the same purported false promises under its Third Claim for Relief. The viability of the allegations will therefore be discussed in Section C below.

B. Second Claim for Relief: "Negligent Misrepresentation"

The Second Claim for Relief realleges the same misrepresentations set out in the First Claim for Relief, with the assertion that they were made without reasonable grounds to believe they were true. The statements in subparagraph (a) are no more actionable as negligent misrepresentations than as intentional misrepresentations.

The statements in subparagraphs (b)-(d) again are promises as to future events. As such, they are not actionable under a negligence theory. *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 159 (1991) ("[W]e decline to establish a new type of actionable deceit: the negligent false promise."). Accordingly, the Second Claim for Relief must be dismissed.

[5] Subparagraph (a) also includes a parenthetical conclusion that "therefore the loan had been approved." This need not be accepted as true, given the clear language of the term sheet that final approval remained contingent on numerous conditions.

C. Third Claim for Relief: "False Promise"

The alleged false promises listed in both the First and Third Claims for relief are (1) assurances Comerica allegedly gave on November 20, 2020, and again on November 23, 2020, that CS could and should pay its contractor's October invoice in the amount of $738,000 without jeopardizing funding of the loan, and that the payment would therefore be reimbursed through the loan proceeds, and (2) an assurance on November 24, 2020, that any violation of the FCCR covenant would be waived.

As noted in the prior dismissal order, to plead false promise fraud a plaintiff must allege facts supporting an inference that the defendant lacked intent to honor the promise at the time it was made. *See Tenzer v. Superscope, Inc*., 39 Cal. 3d 18, 30 (1985) ("[S]omething more than nonperformance is required to prove the defendant's intent not to perform his promise."). Although CS still has not offered anything to suggest that, at the time the term sheet was proposed or during earlier negotiations and communications, Comerica did not intend to make the loan if the parties reached a mutually acceptable agreement and all conditions were met, the allegations of the Second Amended complaint are sufficient to support an inference that by the time of the conversations in late November of 2020, Comerica's representatives were not dealing with CS completely truthfully.

Admittedly, the complaint is equivocal as to whether Comerica had definitely decided against going forward at that time, and the allegations are necessarily somewhat speculative as to what Comerica's undisclosed intent was. At least at the pleading stage, however, CS has a viable claim that Comerica falsely assured it that making the $738,000 payment to it contractor would not jeopardize the loan and/or that any non-compliance with the FCCR covenant would be waived.

It is not wholly implausible that, as CS alleges, Comerica representatives had been looking for a way to turn down the loan that would shift blame away from the bank, so that CS, an "important customer" would not be upset. It is relevant that the loan rejection came so close on the heels of the promises. *See Tenzer*, 39 Cal. 3d at 30 (identifying "hasty repudiation of the promise" as one kind of circumstantial evidence that can support promissory fraud claims).

Additionally, various statements in Comerica's letter terminating the loan application process imply Comerica believed it might have existing contractual obligations—including under the "the Amended and Restated Letter Agreement dated July 31, 2020," which may or may not have actually existed. Indeed, the termination letter expressly stated Comerica was not going forward with the loan because of an "Existing Default," specifically, CS's alleged violation of Section 3(c) of the "Letter Agreement." Although CS is not pursuing any contractual claims in this action, the disconnect between Comerica's position in this litigation that it could not locate any "letter agreement," and its original explanation that it was terminating the loan application because of a specific breach of the "Letter Agreement," creates at least some additional "smoke" at the pleading stage, whether or not CS ultimately will be able to prove any "fire."

Comerica also argues the false promise allegations fail because CS cannot establish that it relied on the assurances it received in late November of 2020. CS's contention is that it made the $738,000 payment to its contractor in express reliance on those assurances. As Comerica points out, that payment was for services already rendered and billed by the contractor, so CS cannot argue it incurred the liability only as a result of the alleged false promises. Accordingly, CS faces a high hurdle to prove what realistic options it had other than paying the invoice, and what damages it suffered as a result of the allegedly false promises. The claim, however, survives dismissal at this juncture.

D. Fourth Claim for Relief: "Fraud—Concealment"

The Fourth Claim for Relief of the SAC recasts the same basic representations discussed above as failures to disclose—*i.e.*, the statements and assurances constitute "concealment" because Comerica did not disclose that they were false. As such, the Fourth Claim for relief is wholly duplicative of the earlier claims. It therefore survives as to the false promises discussed above, and fails to the extent it is based on any of the other representations.

United States District Court
Northern District of California

United States District Court
Northern District of California

V. CONCLUSION

The motion to dismiss is granted as to the representations alleged in paragraph 74(a) of the First Claim for Relief. The motion is denied as to the false promises alleged in the balance of the First Claim for Relief, the Third Claim for Relief, and in the Fourth Claim for Relief. The motion is granted as to the Second Claim for Relief. As the claims being dismissed do not appear subject to cure, no leave to amend will be granted. Defendant shall file an answer within 20 days of the date of this order.

**IT IS SO ORDERED**.

Dated: February 29, 2024

RICHARD SEEBORG
Chief United States District Judge