UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C S BIO CO., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>COMERICA BANK,<br><br>    Defendant. | Case No. 22-cv-05033-RS<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

I. INTRODUCTION

As described in prior orders, plaintiffs CS Bio Co. and CCS Management, LLC (collectively "CS") are related commercial entities who had a long-term banking relationship with defendant Comerica Bank. CS brought this action alleging, in essence, that Comerica backtracked on its promises to provide a new loan to fund the construction of improvements to a property CS owned. In the motion for summary judgment now pending, the central issue is whether there is a triable issue of fact as to damages, and more particularly, whether the categories of damages alleged by CS were caused, in a legal sense, by Comerica's alleged fraud.

With some exceptions discussed below, CS's damage claims are based on comparing the expenses it contends it incurred, and losses of income it allegedly experienced, when the loan was denied to what it asserts its expenses and income would have been if the loan had been approved. In other words, CS believes it can recover damages like those available if Comerica breached an enforceable loan agreement.

The initial complaint included a claim for breach of oral contract. In response to the first motion to dismiss, however, CS withdrew that claim. See Dkt. No. 17. If CS were pursuing a viable breach of oral contract claim, it obviously could assert damages based on what would have happened if the loan had been funded. Because it abandoned that claim (likely because it was not otherwise viable), it cannot.

Both the original complaint and the First Amended Complaint included a claim for relief labeled as "Promissory Estoppel," which also sought to put CS in the same position it would have been had the loan been finally approved and funded. After that claim was twice dismissed with leave to amend, however, CS elected not to pursue it in the Second Amended Complaint. See Dkt. No. 50.

In the now operative Second Amended Complaint (as limited by the order granting dismissal of that complaint in part, see Dkt. No. 64) ("SAC"), the only claims for relief are for fraud, whether characterized as "Intentional Representation" (First Claim for Relief), "False Promise" (Third Claim for Relief), or "Fraud—Concealment" (Fourth Claim for Relief). Specifically, the dismissal order listed CS's surviving claims as arising from Comerica's alleged following false promises:

> (1) on November 20, 2020, and again on November 23, 2020, CS could and should pay its contractor's October invoice in the amount of $738,000 without jeopardizing funding of the loan, and that the payment would therefore be reimbursed through the loan proceeds, and;
>
> (2) an assurance on November 24, 2020, that any violation of the "FCCR covenant" would be waived.[1]

A subsequent order clarified the allegations in the SAC were also sufficient to allow CS to pursue claims that Comerica further falsely promised the financial difficulties of CS's customer Intarcia

---

[1] As alleged in the SAC, "FCCR" refers to "Financial Covenants and Ratios," which was "a measure of C S Bio's ability to pay 'fixed' charges such as rent, debt service, and utilities."

would not preclude final loan approval, and that CS could still present other arguments as to the details of the FCCR issue. See Dkt. No. 95.

At the end of the day, however, CS's case sounds exclusively in false promise fraud. The damages recoverable for false promises are those that flow from the plaintiff's reasonable reliance on the promises, *not* what the plaintiff might have gained had an enforceable contract been formed. Because Comerica has met its initial burden in this summary judgment motion, and CS has not shown there is a triable issue of fact that it suffered legally cognizable damages resulting from the alleged false promises, the motion must be granted.

## II. BACKGROUND

The broad factual circumstances alleged in the SAC and presented in the summary judgment briefing largely conform to those set out in prior pleadings and discussed in prior orders. In 2019, CS engaged a general contractor in anticipation of making significant improvements to certain commercial real estate it owned in Milpitas. The project was expected to cost approximately $13.6 million, which CS intended to fund with $2 million of its existing resources, and an $11.6 million loan from Comerica, $5 million of which was to be guaranteed by the Small Business Administration ("SBA").[2] CS had been doing business with Comerica since 2013, and had existing loans from the bank on other properties.

CS began the loan application process in June of 2019. Comerica advised CS that loan approval would be quicker and easier if CS reduced its existing loan portfolio at the bank. CS therefore replaced one Comerica loan, for approximately $3 million with interest at 3%, with a loan from another lender at 4.25%.

---

[2] The first two versions of the complaint described the $5 million as a loan directly from the SBA, rather than merely a guarantee, such that Comerica would have only been loaning $6.6 million. Under a "term sheet" signed by the parties in September of 2020, as discussed further below, it appeared the original allegations were more accurate. According to the term sheet, the parties anticipated Comerica would issue a primary loan of approximately $6.6 million and a "bridge loan" during construction, which would be repaid by the proceeds of a separate loan from the SBA.

The original complaint and the FAC both alleged the parties entered into a "letter agreement" after "extensive negotiations" between CS and Comerica's Business Banking group. The first complaints did not attach the purported letter agreement or describe its terms in any detail. The SAC, in contrast, attached a copy of the document, which bears a date of "July __, 2020." SAC, Exh. A. Whether or not the letter agreement was ever fully executed, none of CS's claims are based on an argument that it gave rise to an enforceable obligation to make the loan. That said, when Comerica ultimately advised CS it would not proceed with the financing, it referred to and purported to terminate "the Amended and Restated Letter Agreement dated July 31, 2020, between CS Bio Co and Comerica Bank." SAC, Exh. F.

Around the same time the letter agreement was proposed, responsibility for the loan application within Comerica was transferred from the Business Banking group (with whom CS had the long-term relationship) to Peter Wentworth and Bill Burke of the bank's "middle market division." Wentworth and Burke had no prior experience with CS. Like the prior complaints, the SAC asserted "on information and belief" that Wentworth and Burke were both Vice Presidents at Comerica.

Construction of "Phase I" at the property began in or about June of 2020, with CS funding the initial payments to the contractor itself. Because it could "elect to halt construction by mid-September 2020," before proceeding to "Phase II," CS asked Wentworth and Burke about the loan status "several times during the summer and fall of 2020." CS's CEO, Jason Chang, was repeatedly assured the loan for "Phase II" would be approved and that CS should continue to advance construction costs. Comerica told CS to go forward, because it would be reimbursed when the loan went through.

In early September of 2020, Comerica issued a "term sheet," as described in further detail in prior orders. The SAC alleged Comerica represented that (1) once a term sheet was issued, the loan would be approved, (2) term sheets were only issued after loans were internally approved by the bank, (3) the term sheet issued only because Comerica's "Credit partners"—Comerica's internal credit team responsible for loan approvals—had provided a "green light" to do so, and (4)

Comerica's middle market division had "approval to move forward [with the loan] as presented." As described in prior orders, however, the term sheet was replete with conditions and boldfaced warnings that it was not a promise. *See* SAC, Exh. D. ("THIS PROPOSAL IS FOR DISCUSSION PURPOSES ONLY. It does not represent a commitment to loan on the part of Comerica/SBA.")

The SAC asserted the financial covenants in the term sheet for which CS had responsibility were all matters that had previously been discussed and agreed on. The SAC alleges CS signed the term sheet only following a teleconference in which "the fact that C S Bio met the existing financial covenants contained in the term sheet was confirmed." SAC, para. 34. CS alleges it paid its contractor an additional $308,000, and continued its construction project in reliance on the assurances it received in connection with the term sheet. Additionally, in late September of 2020, C S Bio signed a "Phase 2 – Tenant Improvement" change order, which it contends it had delayed signing until it received Comerica's assurances of loan funding.

CS previously contended that prior to December 16, 2020, it had no reason to believe Comerica would not issue final approval and fund the loan, or that there was cause for any substantial concern. CS has now submitted a declaration from its CEO acknowledging he was advised by Comerica in a December 2, 2020, telephone call that the loan would not be funded. Dkt. 127-3, para. 27. Furthermore, in October and November of 2020, the parties had a series of communications regarding at least three topics bearing on whether final approval and funding of the loan was forthcoming.

First, according to CS, the loan should have funded as a matter of course when the SBA issued the guarantee. CS alleges it was told during "multiple check-in calls" that the loan would be funded once the "SBA loan/guarantee" was approved.[3] The SAC asserts that upon SBA approval, Comerica instead "strangely" requested "updated covenant calcs from [C S Bio's finance manager] showing no defaults," which CS insists it had already provided. CS also alleges

---

[3] The complaint's use of the term "loan/guarantee" adds to the uncertainty as to whether the SBA was providing a loan (as alleged in the first two complaints) or only a guarantee (as alleged in the SAC).

Comerica then claimed loan funding would need to await completion of subordination of the SBA's guarantee to Comerica's pending loan.[4] The SAC alleges a Comerica representative later told CS that the bank had used SBA subordination as an excuse to prevent loan funding because, by November 19, 2020, Comerica had either already decided or was in the process of deciding not to fund the loan for other reasons.

Second, the parties had several discussions regarding Intarcia, a pharmaceutical firm that CS acknowledges was its largest customer, accounting for more than 50% of its revenues since 2015. CS alleges it advised Comerica there was a risk Intarcia would declare bankruptcy, but that Comerica assured CS that would not preclude closing the loan, because CS would be permitted to show cash receipts from other customers. SAC, para. 46. CS alleges that, in fact, Comerica's credit team decided sometime in November of 2020 not to fund the loan in light of reports from Wentworth and Burke regarding the Intarcia issue. The SAC asserts "Wentworth and Burke never advised C S Bio of their concerns or the concerns of Comerica's credit team because they did not want to upset an important customer and because they either anticipated or hoped that the SBA would not issue its guarantee. If the SBA failed to issue its guarantee, Comerica could blame the failure to fund the loan on the SBA." SAC, para. 49.

The third ongoing issue involved the FCCR (Financial Covenants and Ratios) requirement CS admits it was obligated to satisfy to obtain the loan. As noted above, FCCR is "a measure of C S Bio's ability to pay 'fixed' charges such as rent, debt service, and utilities." On November 11, 2020, CS provided documentation to Comerica showing its FCCR was 0.84 and therefore not in compliance with either the July 2020 letter agreement (requiring a FCCR of not less than 1.0), or the Term Sheet (requiring a FCCR of 1.20 or greater with exclusion of up to $2,028,000 in capital expenditures for construction). In the following days, however, Comerica directed CS to recalculate the FCCR and ultimately approved a calculation of a FCCR of 2.15, which was based

---

[4] The SAC does not explain how or why a loan "guarantee" would be "subordinated" to an underlying loan. Presumably subordination was an issue because the SBA was actually making a separate loan, not just a "guarantee."

on removing construction costs of, $2.3 million—*i.e.*, an amount greater than the $2,028,000 specified in the term sheet as excludable.

Shortly thereafter, CS asked Comerica what it should do about a pending construction invoice from its contractor issued in late October in the amount of $738,000. Burke and Wentworth advised CS to pay the invoice because it would be reimbursed later through the receipt of loan proceeds, despite the fact that CS had already surpassed the maximum $2,028,000 in construction costs excludable under the term sheet from the FCCR calculation. The SAC alleges Comerica assured CS that any violation of the FCCR covenant would be waived. SAC para. 64. CS alleges it then paid the $738,000 invoice in reliance on Comerica's representations.

Days later, Burke and Wentworth advised CS that it was "pencils down" on C S Bio's loan and that the loan would not be funded. Then, on December 17, 2020, Comerica gave written notice that it had decided not to proceed with the loan because CS Bio was in default of the required "fixed charge coverage ratio" covenant as of September 30, 2020. As noted above, the notice specifically cited "the Amended and Restated Letter Agreement dated July 31, 2020, between CS Bio Co and Comerica Bank." Whether or not that is the same as, or a later version of, the unsigned letter agreement of "July __ 2020," remains unclear.[5] That uncertainty, however, is immaterial to the issue of whether CS has a viable claim for damages resulting from the alleged false promises.

CS contends evidence in discovery shows Intarcia's bankruptcy was the "real" reason Comerica decided not to go forward with the loan, and that the claimed "default" as to the FCCR ratio was pretext. Comerica argues the FCC ratio issue was valid, but also argues that, in any event, the written notice advising CS the loan would not be made also more generally referenced "other reasons relating to the financial performance of Borrowers."

---

[5] In either event, an inference can be drawn that Comerica believed it might have incurred contractual obligations in July of 2020, which it could avoid only if CS had not complied with its corresponding obligations. As set out above, however, there are no claims in this action for breach of contract, nor could there be under the facts as alleged and shown by the present record. Mere concern by Comerica employees in late 2020 that there might be contractual liability does not create such liability.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id*. at 322-23. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties.

To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e*., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986). The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine*, Inc., 501 U.S. 496 (1991) (citing Anderson, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th

Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

IV.  DISCUSSION

A.  <u>Damage claims premised on loan approval</u>

Comerica's motion for summary judgment states CS has identified in discovery the following categories of damages it is seeking:

(1) lost leasing opportunities for the so-called "Kelly Court" and "O'Brien" properties;

(2) damages arising from refinancing a loan on the O'Brien property;

(3) damages arising from refinancing a loan on the Kelly Court property;

(4) damages arising from refinancing the Buckeye Phase I Loan;

(5) damages based on alleged higher costs to obtain the Buckeye Phase II Loan
   (*i.e.*, the loan it had hoped to obtain from Comerica) from Royal Business Bank
   ("RBB") instead;

(6) payment of $738,000 to its contractor in November 2020; and

(7) diverted employee time.

CS's opposition to the summary judgment motion takes no issue with Comerica's categorization of the damages claims. Rather, as noted in the order for further briefing, CS's opposition described its claimed damages in two section headings: "F. As a Result of Loan Termination, CS Bio Needed to Secure a New Lender, Construction Was Delayed, and Lucrative Leasing Opportunities Vanished," and "G. CS Bio Was Also Damaged Through Higher Interest Rates."

The order for further briefing observed that CS's damage claims therefore primarily focused on financial benefits it contends it would have received (or expenses it would have avoided) if the Comerica loan had been approved and funded. *See*, *e.g.*, Dkt. 129-2 at ECF p. 27

("the primal cause of all delays was Comerica's cancellation of the Term Sheet, which delayed final construction of the Buckeye Property.") The briefing order invited CS to address whether damages premised on what would have happened if the loan had been approved and funded are recoverable in an action for false promise fraud, where there is no viable claim for breach of contract or promissory estoppel.

In response, CS has presented no authority or rationale supporting the notion that a plaintiff can effectively obtain the benefits of a contract that was never enforceable under the guise of a claim for promissory fraud. The law to the contrary is clear. "[A] claim of fraud cannot be permitted to serve simply as an alternative cause of action whenever an enforceable contract is not formed." *Conrad v. Bank of America*, 45 Cal. App. 4th 133, 156–57 (1996).

In *Conrad*, plaintiffs alleged that G.F. Burk, the manager of a Bank of America branch office, falsely promised the bank would make a loan to them. As is the case here, "plaintiffs' discussions with Burk did not reach the point of becoming a contractually binding loan agreement." *Id.* at 159. The *Conrad* court noted, "[m]isrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages. [citations]. And the damages suffered must be referable to, and caused by, the fraud." *Id*.

Because the *Conrad* plaintiffs "did not go to trial on a breach of contract claim," and "their claimed damages all related to their inability to obtain a loan rather than to any detriment caused by" the alleged false promise, they had "failed to show damage specifically attributable to the" alleged false promise "and accordingly failed to establish a cause of action for fraud based upon that promise." *Id.* at 160. For the same reason, CS's damage claims premised on what would have happened if the loan had been approved are legally untenable.

In response to the order for further briefing, CS acknowledged that most of its claimed damages are intended to put it in the position it would have been if the loan had been approved and funded. At oral argument, CS likewise acknowledged its damages theories primarily were based on assuming what would have resulted had the loan gone through.

CS's supplemental brief also argued the briefing order was "extending" the prior rulings on

the motions to dismiss by suggesting such damages are not recoverable. Not so. It is true that CS voluntarily abandoned its claim for breach of an oral contract, and that it elected not to amend its promissory estoppel claim following the rulings that it had not alleged facts showing a promise to loan on which it could reasonably rely. That CS cannot claim damages based on what would have happened if the loan had been approved and funded, however, is not an "extension" of the prior orders, but the legal consequence of the fact that this is only an action for promissory fraud, as discussed above.[6]

CS's suggestion in its further briefing that the court should reconsider its prior rulings on the motions to dismiss is procedurally improper and without substantive merit. Accordingly, summary judgment is warranted with respect to CS's damage claims premised on what it contends would have resulted if the loan had been approved and funded.[7]

B. Other damages

CS's further briefing asserts it suffered three categories of damages that do *not* rely on what would have resulted had the loan been funded.[8] First, CS contends that in reliance on the alleged false promises it "went forward with the second phase of construction and incurred construction costs of $738,215 (for work in September 2020), $703,663 (for work in October 2020), and $8,519,803 (for work thereafter) that it could have avoided." As Comerica points out, the $738,215 payment represented completed work for which payment was already

---

[6] The reframing of the allegations as "concealment" in the Fourth claim for relief does not alter the analysis. CS merely alleges that Comerica "concealed" the fact that it did not intend to honor its promises.

[7] Comerica's motion argues those claims fail for numerous other evidentiary and logical reasons. Because damages based on what the loan would have provided are categorically unavailable, those contentions need not be addressed.

[8] CS makes a passing assertion that it could develop other damage categories through limited additional expert discovery. CS has not requested continuance of this matter to permit such discovery, however, nor is there any reason to believe such a continuance would be warranted. See Fed. R. Civ. P. 56(d).

owed at the time of the alleged false promises. More fundamentally, however, CS's conclusory assertion that these expenses "could have been avoided" is insufficient to create a triable issue of fact that they are compensable damages. The record is clear that CS wanted the construction to take place, agreed to its contractor's pricing, and ultimately received the improvements. If it had elected not to proceed with the construction, it might not have incurred further costs, but it also would not have received the benefits of the completed project. Permitting CS to recover as "damages" sums it paid for a construction project it wanted and received, would represent a windfall, not compensation for an economic injury.

Next, CS contends it executed a change order increasing the costs of its Phase II construction by $3.23 million, believing Comerica would fund the loan. Again, sums CS spent on a project it wanted and got are not a proper measure of damages, even assuming CS might have economized or delayed committing to the spending had it not been expecting the Comerica loan to close in the near future.

Finally, CS contends it incurred fees and had to accept a higher interest rate when it refinanced an existing loan on another property, as purportedly required under the term sheet. CS asserts that refinancing was completed on some unspecified date in December of 2020. As noted above, however, CS now admits it knew by December 2, 2020, that Comerica was not going to approve and fund the loan. CS has not shown a triable issue of fact as to any damages resulting from the alleged misrepresentations, even aside from its claims based on what would have resulted had the loan funded. Summary judgment is warranted.

## V. CONCLUSION

Comerica's motion for summary judgment is granted. Comerica's motion to preclude plaintiff from introducing certain categories of evidence, none of which would alter the analysis above, is denied as moot, as is Comerica's unopposed motion to bifurcate the issue of punitive damages.

CS's motion for an adverse jury instruction is moot in light of the fact that there is no

triable issue of fact. Furthermore, the alleged failure to preserve evidence on which that motion is based relates exclusively to communications and conduct of Comerica, potentially relevant to liability. There is no suggestion that any of the evidence not preserved would be relevant to CS's damage claims, which turn on what CS did or did not do in reasonable reliance on the alleged false promises. The motion for an adverse jury instruction is therefore denied as moot, even to the extent it might be deemed as seeking an inference at the summary judgment stage.

Finally, the parties have met and conferred as to the sealing motions at Dkt. Nos. 114, 116, and 129, and reached appropriate stipulations as to the scope of the materials previously designated as confidential but which do not warrant sealing, and the more limited materials that may properly be maintained under seal. Accordingly, the parties' stipulated proposed orders at Dkt. Nos. 121 and 132 will be separately entered. No response was filed to the sealing motion at Dkt. 125, which will therefore be denied, without prejudice.

**IT IS SO ORDERED**.

Dated:

_____
RICHARD SEEBORG
Chief United States District Judge